## THE INDOMABLE.

(Circuit Court of Appeals, Second Circuit. January 30, 1922.)

### No. 151.

1. **Shipping ⊚⇒87½—Repair contractor held entitled to compensation for tugboat service in addition to lump sum bid.**

 Charges for hauling and for tugboat service in assisting to dry-dock a schooner which it was subsequently learned would have to be repaired, which charges were not included in the specifications or order for repairs, were not covered by the lump sum bid by the dry dock company for making of repairs, since those services were distinct and separate from the order for repairs.

2. **Shipping ⊚⇒87½—Shoring in dry dock held part of work covered by lump sum bid for repairs.**

 Where the order for the repair of a vessel provided that no work entailing additional expense would be allowed in the order, the repair contractor, who had bid a lump sum for making the repairs specified in the order, cannot recover, in addition to the contract price, for material and labor expended in shoring up the vessel in dry dock, which was a necessary incident to the work.

3 **Shipping ⊚⇒87½—Evidence held not to sustain finding "dockage" was not included in bid for repairing vessel.**

 Where a shipowner gave an order for repair of the vessel, after she had been placed in dry dock and several days had been spent in surveying and negotiating preliminary to contract for repairs, and libelant's testimony that the bid for the repairs was to include the charge for dockage,

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

which is the compensation for the use of a dock in the nature of rent while the vessel is undergoing repairs, was not specifically denied by the contractor and was supported by the fact the contractor made no charge for dockage after the order for repairs was given, a finding that the charge for dockage prior to the order for repairs was not included in the contract was not sustained by the evidence.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Dockage.]

Appeal from the District Court of the United States for the Eastern District of New York.

Libel in admiralty by James Shewan & Sons, Inc., against the schooner Indomable; Reuben I. Cameron, claimant. Decree for libelant, and claimant appeals. Modified, with instructions.

Curie, Lane & Maxwell, of New York City (John Edmond Hewitt, of New York City, of counsel), for appellant.

Foley & Martin, of New York City (James A. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge. It is not disputed that libelant did certain work and furnished certain materials for the Indomable of the reasonable value of $949.20. Adding interest and costs to that sum, the total is the amount decreed to be paid to libelant. Appellant, however, insists that the work and materials were respectively done and furnished as a part of a later contract and that the charge therefor was merged in that contract.

The controversy is solely as to the facts, and is barren of any question of law, as the contention below by appellants as to accord and satisfaction is not pressed here. If the case were one where witnesses whom the District Judge saw and heard merely contradicted each other, we should be disinclined to disturb the decree, in the absence of some other enlightening facts or features; but, while there are contradictions, the testimony does not in our opinion bear the construction which the District Judge gave to it.

Libelants are in the dry dock and repair business. The schooner Indomable is owned by Cameron. The schooner arrived at libelant's dry dock on October 7, 1920, for the purpose of having the bottom scraped and painted. The arrangement was made in the informal manner so familiar in cases of this character. Curley, libelant's general manager, said to some one who called him on the telephone, "We could put the vessel on the dry docks and have her bottom painted." The vessel was hauled out on the dry dock on October 8th, and it was then discovered that considerable work was necessary in addition to that originally contemplated.

One Moses, a lieutenant commander in the navy on the retired list, was Cameron's superintendent. On October 8th he had a talk with Curley, in the presence of Capt. Gardner, a surveyor; Mr. Shewan being present part of the time. Moses stated that he had been instructed by Cameron to have all the work done as required by Gardner and the Veritas surveyor. Thereupon Curley told Gardner "to go up in the

office and draw up a list of items." Moses went with Gardner, and the latter made out five copies of a list. This list is dated October 8, 1920, and headed "Specifications for Repairs on the Schooner Indomable." It is typewritten, and sets forth the details of a considerable amount of repairs.

Cameron testified that, after the vessel had been hauled out on the dock, he had Gardner and the underwriter's surveyor and Moses look "at the bottom work that was contemplated and the vessel," and that Moses, Gardner, McBrearty (Cameron's partner), Hasselgren (an employé of Cameron), and Cameron himself were at the ship on October 8th, after it had been determined that extensive repairs were necessary on her keel. After this group looked over the work, they went to Curley's office, and Gardner and Moses stated that they would draw up a list of the repairs necessary to place the vessel in a thoroughly seaworthy condition. Cameron further testified:

"We informed Mr. Curley that we would probably have the work done there, providing their bid was sufficiently low to warrant it; that we wanted a lump sum bid, covering all expenses from the time that the vessel had been delivered to their dock up until the time that those repairs were completed, because it was such a big job that we figured she would be a little while in dock. * * * We left then, and left the matter with Capt. Moses and Capt. Gardner to get together on what the job would cost."

Some time later in the day, Gardner, Curley, and Moses had a conversation, at which the list of specifications was gone over item by item, and, according to Moses, certain pencil notations were made, in part by Gardner, and in part by Moses, and, while not shown to Curley, were discussed with Curley. There was an item, noted in pencil, entitled "Necessary dockage," and against this Gardner or Moses had put down $1,650. Moses observed, "This necessary dockage seems pretty high;" to which Curley answered, "There is a lot of labor and a lot of lumber to be used on that vessel." Gardner left, and later in the conversation Moses said to Curley, "You will get the work because that will save us the cost of docking;" and Curley answered, "That will be a big item." At a previous conversation, according to the testimony of Moses, he told Curley that Cameron wanted to know what it would cost "for the docking in case the vessel is taken away," and to this Curley answered, "Well, never mind that now; if we get the bottom job, that will be included in the lump sum: * * * if the vessel is taken away, then you will pay for the docking and the painting and the scraping." The figure of $1,650, above referred to, had been mentioned by Curley as the amount to cover dockage. Moses also testified to a conversation as follows:

"I said: 'Mr. Curley, what will it cost to dock the vessel? Mr. Cameron wants to know for the written orders.' Mr. Curley said: 'We will make it out later. If we get the bottom job, that will be included in the lump sum. If not, they will pay for it.' That was repeated later, when I said: 'I think your bid is low and I hope you will get it.' He said: 'It will save you about a thousand dollars. If it goes to another yard, you will have to pay for the dockage.'"

The specifications were submitted to other repair yard concerns in addition to libelant. Libelant, under date of October 13th, made its bid as follows:

"We hereby offer to make renewals and repairs on the schooner Indomable in accordance with specifications for the sum of * * * $10,273."

Apparently on the same day Cameron accepted libelant's offer in an order which read:

"Please supply the following stores to above-mentioned steamer and department lying at pier yours at once."

Then followed the details, which were the same as those contained in the paper dated October 8, 1920, setting forth specifications for repairs. The order concluded:

"The above renewals and repairs to be made by you in twelve days for the sum of ten thousand two hundred seventy-three dollars. * * * No work entailing additional expense will be allowed for on this order."

This work was done, and in addition certain other work was done, viz. painting and installing a new rudder stock, for which separate orders were given. On October 30th, Cameron, McBrearty, and Hasselgren called at Curley's office and paid him four bills by four checks. One bill covered scraping of the bottom, another was for the rudder stock, another for the painting, and the last of the list was for the extensive repairs covered by the bid of $10,273. No other bill was mentioned by the parties present, upon the payment of the four bills. After making a correction in one of the bills, Curley released the schooner, and she was towed away to another dry dock; Curley having insisted that the bills must be paid before the schooner would be permitted to get away.

Later, on November 9, 1920, a bill was rendered for $949.20; Curley testifying that on October 30th he did not know of the existence of this bill, but that it had been made out and had been overlooked. Failure to remember a bill incurred in dealings with a busy and large business concern is, of course, not unusual; but in this case Curley knew all about this matter, and it seems strange that he should have forgotten this bill or the subject-matter of it, when Cameron and his associates were settling up with him on October 30th. This bill was for work done and materials furnished between October 8th and 13th, and was as follows:

To hauling out 1,072 tons, $12 per ton.................................$128.64
To 3 lay days, 1,072 tons, $10 per ton............................... 321.00
To services of tugboats assisting to dock and shifting................ 175.00
To 20 pounds nails, 10 cents per pound............................... 2.00
To 504 feet yellow pine, 12 cents per foot........................... 60.48
To labor building blocks and shoring up vessel in overtime........... 249.60
To 5 per cent. on labor to cover all workmen's liability insurance...... 12.48
                                                                      ————
                                                                      $949.20

The last group of items, beginning with the charge for the nails, was in connection with shoring the vessel. Claimant contends that it is obvious that all the items of this bill were contemplated in connection with the $10,273.00 bid, frankly conceding that, if libelant had not received the order, then libelant would have been entitled to payment of this bill. Libelant insists that there was no agreement between the parties which included or contemplated the inclusion of these items in

the bid. As opposed to the testimony of Cameron, Moses, Hasselgren, and McBrearty on the essential questions involved, there was the testimony of Curley alone. The rebuttal testimony was particularly directed to a dispute as to the painting bill. The following is all that was elicited from Curley in respect of the bill now in dispute:

"Q. Was there any conversation where you were informed that your bid was to include all expenses? A. No, sir.

"Mr. Hewitt: There is no such contention. It was to include the hauling out and shoring up.

"Q. Was there any such conversation as that it was to include the hauling out and shoring up? A. No, sir.

"Q. Had that already been done when you submitted your bid? A. Yes, sir."

[1] It will be noted that no question was asked as to the dockage charge, and hence there was no testimony given in rebuttal in that regard.

As the charges for hauling and for tugboat service in assisting to dock were not included in the specifications or the order, we accept the finding of the District Court in favor of libelant as to these two items. Besides, these services were quite distinct and separable from the order for repairs.

[2] In respect of the charges for shoring, it will be remembered that the order provided that "no work entailing additional expense will be allowed in this order." Whichever version of the contending parties is right as to the conversations had, it is plain that shoring would be a necessary incident of doing the work covered by the large order, and the specifications and order necessarily contemplated that shoring must be done in order to perform the work under the order awarded on the bid, and particularly is this so because, although the order was not given until October 13th, the specifications were fully discussed on October 8th, and, if Curley had expected additional pay for the shoring, he should have made that fact clear.

[3] In respect of dockage (3 lay days, $321), it has been pointed out, supra, that there was no specific denial in the testimony on behalf of libelant that dockage was to be included. "Dockage" is a word of known meaning. It is defined as:

"The pecuniary compensation for the use of a dock while the vessel is undergoing repairs. It is in the nature of rent, and the owner of a dry dock has the right to demand from those who seek its use whatever he considers a fair compensation. * * *" Ives v. The Buckeye State, 13 Fed. Cas. 184, 185.

It will be noted that there was no specific charge for dockage subsequent to October 13th, and this fact shows a practical construction of the contract by the parties, which sustains the understanding which Cameron and his associates had that no specific charge would be made for dockage, but that the bid and the order were based on the assumption that, as the work was being done at libelant's yards, the bid and order included any charge for dockage. In the circumstances disclosed in the testimony, it is plain that the parties did not contemplate that an extra charge for dockage should be made for any period of time be-

tween October 8th and October 13th, in the event that the contract should be awarded to libelant.

For the reasons supra, without further analysis of the testimony, we think there should be eliminated from the bill all of the items except that for hauling and that for services of tug boats. These aggregate $303.64, and a decree will be awarded for that amount, with interest from November 10, 1920.

The decree is modified accordingly, with half costs in this court, and the District Court is instructed to enter a decree for $303.64, with interest from November 10, 1920, but without costs in the District Court.